IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDRE MAMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    **Case No. 3:18-CV-2095-MAB** |
| | ) |
| MOHAMMED SIDDIQUI, | ) |
| JACQUELINE LASHBROOK, | ) |
| ROBERT SMITH, STEPHEN RITZ, | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| MICHAEL MOLDENHAUER, and | ) |
| JOHN BALDWIN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment filed by all Defendants (Doc. 145, Doc. 146). For the reasons explained below, both motions are granted.

## BACKGROUND

Plaintiff Andre Mamon is an inmate in the Illinois Department of Corrections. He filed this civil rights action pursuant to 42 U.S.C. § 1983 in November 2018 (Doc. 1). He alleged that he slipped and fell on wet stairs at Menard Correctional Center and sustained a serious head injury, which developed into a tumor that went untreated until it ruptured and required emergency surgery (Docs. 1, 8, 66, 67). As it stands now, Plaintiff is proceeding on the following claims:

**Count 1:** Eighth Amendment claim against Wexford for delaying Plaintiff's

medical care for a hemangioma tumor, headaches, and blurry vision by instituting a policy of understaffing the prison healthcare unit.

**Count 2:** Eighth Amendment claim against Wexford, enforced by Siddiqui, Shah, Moldenhauer, Ritz, and Smith, for unnecessarily prolonging Plaintiff's pain and suffering associated with his hemangioma tumor, headaches, and blurred vision by instituting a policy of providing inadequate pain medication to inmates.

**Count 4:** Eighth Amendment claim against Wexford for turning a blind eye to the inadequate medical treatment provided to inmates at Menard.

**Count 8:** Eighth Amendment claim against Defendants Siddiqui, Shah, Smith, Ritz, Wexford, and Lashbrook for responding with deliberate indifference to Plaintiff's complaints of headaches, blurred vision, and a painful lump on his head from March 2017 until April 2018.

(Doc. 66; Doc. 115).

Discovery on the merits began in late January 2021 (*see* Doc. 116), and proceeded for over a year and a half (*see* Doc. 135). Defendants filed their motions for summary judgment on October 14, 2022 (Docs. 145, 146; *see also* Doc. 147). Plaintiff filed a response in opposition (Doc. 153),[1] to which the medical Defendants filed a reply (Doc. 156).[2]

## FACTS[3]

On March 24, 2017, Plaintiff fell on the stairs at Menard and sustained a significant cut on his head (Doc. 153-1; Doc. 153-2, pp. 2–3). Plaintiff was taken to Memorial Hospital

---

[1] Plaintiff filed his original response on November 28, 2022, with some portions redacted (Doc. 153). After the Court denied his request to keep the redactions, Plaintiff filed a completely unredacted version of his response brief (Doc. 158). All citations to Plaintiff's response brief are to Doc. 158.

[2] Defendant Jacqueline Lashbrook did not file a reply brief.

[3] The facts recounted in this section pertain only to Plaintiff's medical care. The facts underlying Plaintiff's claim of deliberate indifference against former Warden Jacqueline Lashbrook are recounted within the Discussion of that claim later in this Order.

in Chester, Illinois, where he underwent a head CT (which was negative) and the laceration was closed with nine staples (Doc. 153-2, pp. 3, 18–24). On April 4th, a nurse at Menard removed the staples from Plaintiff's head and noted that the laceration was "well healed" (Doc. 153-2, p. 4). Plaintiff was supposed to have a follow-up appointment with a physician, but it was canceled twice—first because the clinic "ran out of time" and second because of a nursing staff shortage—and never rescheduled (*see id.* pp. 3, 5, 19).

On April 20, 2017, Plaintiff went to nurse sick call about a 0.75 inch "nodule" at the site of his head laceration (Doc. 153-2, p. 6). He stated that he first noticed it about two weeks prior "as a small bump" and it gradually increased in size. He denied having headaches and said he was not currently in any pain; he only felt pain with palpation or pressure to the area. He was given ibuprofen and referred to see the physician.

By May 8th, Plaintiff had still not seen a physician, and he went back to nurse sick call for a rash (which was unrelated to the head nodule) and was once again referred to see the physician (*Id.* at p. 7). He was scheduled to see a physician on May 25th, but the appointment was canceled for reasons not explained in the medical record (*Id.* at p. 8), and apparently never rescheduled (*see* Doc. 153-2; Doc. 147-2). Plaintiff went back to nurse sick call about the lump on his head on May 27th and again on July 25th (Doc. 153-2, pp. 9, 10). Both times he was referred to see the physician (*Id.*). At the July appointment, the nurse noted that the mass was "a quarter to half dollar sized lump" with no bruising or redness (*Id.* at p. 10). Plaintiff reported experiencing "only occasional pain" when he laid on the right side of his head and did not exhibit any signs of obvious discomfort (*Id.*).

Plaintiff finally saw a doctor for the first time on August 17th, nearly four months

after he was initially referred to a physician about the lump on his head (Doc. 153-2, p. 11). Dr. Mohammed Siddiqui noted that the mass was approximately 5 centimeters, "subcutaneous" (meaning the layer of tissue just under the skin), "mobile," and "non tender" (*Id.*; *see also* Doc. 147-4, p. 41). Based on Plaintiff's history and his examination, Dr. Siddiqui diagnosed the mass as a "possible lipoma," which is a "benign, fatty tumor," and ordered a follow-up appointment in three months (Doc. 153-2, p. 11; Doc. 147-4, p. 41).[4]  There is no indication in the notes that Plaintiff complained of headaches or blurred vision at this visit (*see* Doc. 153-2, p. 11; Doc. 147-4, p. 42).

On September 27, 2017, Plaintiff was scheduled to be seen at nurse sick call for "migraines" (Doc. 153-2, p. 12). Defendants represent, and Plaintiff did not dispute, that this is the first mention of headaches in the medical record (Doc. 147-1, p. 2, para. 4; *see* Doc. 158). The medical record indicates that Plaintiff refused the appointment so that he could go to yard (Doc. 153-2, p. 12; *see also* Doc. 147-2, p. 21 (refusal form)). Plaintiff, however, disputes that he refused to attend this appointment (Doc. 153, p. 13; *see* Doc. 147-10, pp. 30, 31; *see also* Doc. 147-2, p. 21).

---

[4] According to the Mayo Clinic, a lipoma is a slow-growing, fatty lump. *Lipoma*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/lipoma/symptoms-causes/syc-20374470 (last visited March 1, 2024). A lipoma "usually is harmless," "usually isn't tender," and "is rarely a serious medical condition." *Id.* However, it can be painful if it grows and presses on nearby nerves or contains many blood vessels. *Id.* "Treatment generally isn't necessary, but if the lipoma bothers [the patient], is painful or growing, [the patient] may want to have it removed." *Id.*

Physicians in this case testified that a lipoma is soft, round or oval shaped, with generally smooth borders, is very superficial and can be moved under the skin, and generally does not cause pain (Doc. 147-11, p. 75 (Smith depo); Doc. 147-9, p. 32 (Martin depo)). Conversely, a mass that is malignant exhibits some combination of the following characteristics: asymmetrical or irregularly shaped, firmer or harder than expected, fixed and does not move freely, painful, very rapidly growing, and large, like "five, six centimeters, 10 centimeters," and ulcerated or eroding (Doc. 147-11, p. 75 (Smith depo); Doc. 147-9, pp. 29, 31, 32 (Martin depo); Doc. 147-8, p. 27 (Woods depo)).

Plaintiff did not complain about headaches again until November 1, 2017, when he saw nurse practitioner Zimmer (a non-Defendant) (Doc. 153-2, p. 13). Plaintiff reported the mass had gotten bigger since he last saw Dr. Siddiqui and that he was having "headaches in [the] temple area and pain in [the] cyst area." NP Zimmer noted a "10cm cyst like area," with no warmth or redness. NP Zimmer planned to submit a referral request to Collegial Review for an ultrasound "due to the [increase] in size" of the mass.

Plaintiff went to nurse sick call on November 18th, where he complained of a headache for the past week (Doc. 153-2, p. 14). He also complained for the first time about blurry vision in his right eye. Plaintiff was given over-the-counter pain reliever (which he had not yet tried) and was referred to see the physician. Plaintiff saw Nurse Practitioner Michael Moldenhauer ten days later, on November 28, 2017 (Doc. 153-2, p. 15; Doc. 147-3, pp. 46–47, 74–77). NP Moldenhauer described Plaintiff's forehead mass as a "plum-sized knot." He noted that a request to Collegial had been made on November 1st (by NP Zimmer) for "evaluation" of the "knot." He told Plaintiff to start taking Naproxen 500 mg twice per day as needed. He also increased Plaintiff's blood pressure medicine because elevated blood pressure could potentially cause headaches. And he referred Plaintiff to an optometrist for his headaches and blurred vision.

Plaintiff saw Dr. Siddiqui the following day at a quarterly visit in the hypertension clinic (Doc. 153-2, pp. 27–28). Aside from the notes about Plaintiff's blood pressure, Dr. Siddiqui also noted that Plaintiff had a subcutaneous cyst on the right side of his forehead, but the doctor did not take any further action because the appointment was limited to Plaintiff's high blood pressure (*Id.*; Doc. 147-5, p. 62).

A month later, on the day after Christmas, Plaintiff hit his head on the corner of the desk in his cell and cut open the mass, but it was only a "superficial" wound with "scant bleeding" (Doc. 153-2, pp. 16–17; 31–32). The nurse nevertheless scheduled Plaintiff to see NP Zimmer the following day, who noted that Plaintiff had a cyst on his upper forehead with a small laceration, but her exam was otherwise normal (Doc. 147-3, pp. 24–26). Plaintiff also saw Dr. Shah that same morning in the "emergency room" at Menard and told Dr. Shah that he "want[ed] to cut open" the mass on his head (Doc. 153-2, p. 33; Doc. 147-5, pp. 55–56, 58–59 (Shah depo)).[5] Dr. Shah testified that he thought the mass looked like a cyst, and he planned to make an incision to try and drain the fluid from it (*see* Doc. 147-5, pp. 60, 62–63; *see also id.* at pp. 66, 69; Doc. 147-2, p. 22 (signed consent form)). However, when Dr. Shah cut into the mass, he saw "a lot of blood and fatty tissue," and realized it was not a cyst (Doc. 153-2, p. 33; Doc. 147-5 pp. 63, 67–70).[6] Dr. Shah stitched the incision closed (Doc. 153-2, p. 33; Doc. 147-5 pp. 62–63). Based on what he saw, Dr. Shah diagnosed the mass as a "hematoma and lipoma" (Doc. 153-2, p. 33; Doc. 147-5 pp. 61–62, 67–70). He ordered that Plaintiff be given an ice pack and Tylenol as needed, and that the stiches be removed in seven days (which was done by a nurse on January 7, 2018) (Doc. 153-2, pp. 33, 34; Doc. 147-5, pp. 58, 66).

Plaintiff hit his head and cut open the mass a second time on the night of January

---

[5] There is no indication in the record as to how Dr. Shah came to see Plaintiff, (*see* Doc. 153-2; Doc. 147-2), but Dr. Shah testified that the usual practice was that someone called him from the emergency room and asked him to come see a patient (Doc. 147-5, pp. 55–56).

[6] Dr. Shah testified that if it was a cyst, then he would see only fluid when he cut into it, not fatty tissue (Doc. 147-5, pp. 69–70). Dr. Siddiqui similarly affirmed that it was not a cyst based on the fact that it bled (Doc. 147-4, p. 69).

28, 2018 (Doc. 147-2, pp. 28–29, 61). A nurse stopped the bleeding and dressed the wound. At the time, Plaintiff denied any headache, nausea, or dizziness and his neurological exam was within normal limits. Plaintiff was given a three-day supply of Tylenol and scheduled for a follow-up with a physician (*Id.*; *see also* Doc. 153-2, p. 35). However, his appointment with the physician was canceled because the clinic "ran out of time;" it was rescheduled for January 31st (Doc. 153-2, p. 35). Plaintiff saw Dr. Siddiqui on January 31st (Doc. 153-2, p. 35; *see also* Doc. 147-4, pp. 63–64). Dr. Siddiqui's note from that appointment recounts that Plaintiff suffered a "[Right] temporal lesion [on] 3/17," which "[t]hen developed into a swelling[.]" The mass "was incised by Dr. Shah 12/27/17" and there was "significant hemorrhaging[.]" Plaintiff had "throbbing pain at the site of lesion," as well as "headaches" and "[decreased] vision [with] blurring." Dr. Siddiqui testified that he did not believe the mass was a lipoma like Dr. Shah diagnosed because "lipomas don't bleed like that" (Doc. 147-4, p. 64). He thought Plaintiff needed to be sent to a specialist for further evaluation (*Id.*). Dr. Siddiqui completed a referral form seeking approval for a general surgery evaluation, due to "Tumor [right] temporal area. Suspected to be a cyst [but] incision done 12/27/17 by Dr. Shah[,] associated with hemorrhage" (Doc. 153-2, p. 58; Doc. 147-4, p. 68). Dr. Siddiqui also referred Plaintiff to see the eye doctor (Doc. 153-2, p. 35).

The referral request for a surgical evaluation was presented in Collegial on February 8, 2018, to Dr. Robert Smith, who worked as a corporate physician for Wexford

doing utilization management (Doc. 153-2, pp. 36; 59–60; Doc. 147-11, p. 7 (Smith depo)).[7] Dr. Smith did not approve the request for a surgical evaluation and instead opted for an "alternative treatment plan," asking Dr. Siddiqui "to evaluate patient onsite and re-present with current detailed assessment" (*Id.* at p. 59).

Dr. Siddiqui saw Plaintiff three weeks later on March 8, 2018 (Doc. 153-2, p. 37; *see also* Doc. 147-4, p. 74). The note from that visit states that Plaintiff had a large temporal mass that had "grown bigger and more painful." An incision and drainage was attempted in December but there was no drainage, just some blood. Dr. Siddiqui noted that Plaintiff had a history of injury a year prior. On examination, Plaintiff had a solid mass in the right temporal area that was moveable and had grown in size. Dr. Siddiqui wrote it was likely a "solidified hematoma." He planned to submit another referral request to Collegial with a photograph (Doc. 153-2, pp. 37, 61).

Before the referral request was presented to Collegial, the eye doctor saw Plaintiff and diagnosed him with a cataract in his right eye (Doc. 147-2, pp. 33, 60). The eye doctor wrote that he would order glasses for Plaintiff and follow-up in one month (*Id.*).[8] The second referral request was presented in Collegial on March 15, 2018, to Dr. Stephen Ritz, who served as Wexford's Corporate Utilization Management Medical Director (Doc. 153-2, p. 38; Doc. 147-6, p. 8). It does not appear that a photo was provided like Dr. Siddiqui intended because Dr. Ritz did not approve the request and asked for a recent photo of the

---

[7] Dr. Smith testified that he did not normally cover utilization management on Wexford's contract with the IDOC and only did so on occasion as a fill-in (Doc. 147-11, p. 9).
[8] However, Plaintiff refused to attend that follow-up appointment (*Id.* at pp. 37, 60), and it is unclear from the records submitted whether Plaintiff ever received glasses in 2018 (*see* Doc. 147-2, Doc. 153-2).

mass (Doc. 153-2, p. 62; *see* Doc. 147-6, pp. 45–50, 72). A week later, Dr. Ritz reviewed the recent photo and once again declined to approve the request for a surgical evaluation, this time in favor of obtaining an onsite ultrasound and then re-presenting with the results (Doc. 153-2, pp. 64, 65; Doc. 147-6, pp. 50–51, 73).

On March 27, 2018, Plaintiff saw NP Moldenhauer (Doc. 153-2, p. 38; Doc. 147-3, pp. 50, 52–53). It is not clear from the medical records submitted to the Court what prompted this visit, but there is no indication that Plaintiff complained about headaches or pain (*see* Doc. 147-2; Doc. 153-2). NP Moldenhauer noted that the "large protrusion" on Plaintiff's forehead stuck out about 1.5 inches and it was red, but there was no warmth or drainage (Doc. 153-2, p. 38). Moldenhauer prescribed Plaintiff a course of antibiotics in case there was an infection (*Id.*; Doc. 147-3, p. 50). Three days later, on March 30th, Plaintiff went to nurse sick call and complained of "constant, throbbing" pain from the mass, which he rated as a 10 out of 10 and said kept him from laying on his right side (Doc. 153-2, p. 39). The nurse gave Plaintiff ibuprofen and referred him to see the physician. Plaintiff saw Dr. Siddiqui on April 4th, who noted that the "large mass" was "rapidly growing" and "painful" (Doc. 153-2, p. 40). Dr. Siddiqui submitted another referral request to Collegial for a surgical evaluation (*Id.* at p. 66). A day or two later, Dr. Ritz reviewed the request in Collegial and once again denied it in favor of waiting for the results of the ultrasound scheduled for April 13th (*Id.* at pp. 67, 68).

The report from the ultrasound on April 13th stated, "solid hypervascular mass measuring 3.5 cm . . . Differential considerations include both malignant and benign etiologies" (Doc. 153-2, pp. 41, 69). On April 19th, Dr. Ritz approved the request for a

surgical evaluation (Doc. 153-2, p. 70). However, the next morning—before any action had been taken on the approved referral—Dr. Siddqui ordered that Plaintiff be taken by ambulance to the hospital because the mass had burst open the night before and was actively bleeding (*Id.* at pp. 42, 43). While at Memorial Hospital Carbondale, the mass was completely removed and the wound was closed with eight stitches (*Id.* at pp. 43, 71–75; *see also* Doc. 147-2, pp. 51–58). Plaintiff was discharged back to the prison that same day with instructions to rotate ibuprofen and acetaminophen as needed for pain. Upon his return to the prison, Plaintiff was held in the infirmary for observation as ordered by Dr. Siddiqui (Doc. 153-2, p. 43). At a follow-up appointment with Dr. Siddiqui on April 23rd, Dr. Siddiqui advised Plaintiff that he would have a significant scar at the surgical site (Doc. 153-2, p. 45). Plaintiff's sutures were then removed on May 4, 2018 (*Id.* at p. 46).[9]

Pathology determined that the mass was a cavernous hemangioma (Doc. 153-2, p. 71). The doctors in this case testified that a hemangioma is a vascular tumor – "basically a bundle of blood vessels" (Doc. 147-9, p. 23 (Martin depo))—that is benign and cannot become malignant (Doc. 147-8, pp. 75–76 (Woods depo); *see also* Doc. 147-4, pp. 64, 99 (Siddiqui depo); Doc. 147-5, p. 97 (Shah depo); Doc. 147-6, p. 61 (Ritz depo); Doc. 147-11, pp. 75–76 (Smith depo)). Dr. Siddiqui testified that a hemangioma "can be left alone without treatment, without surgery" (Doc. 147-4, p. 84). Defendants' expert, Dr. Timothy

---

[9] Plaintiff set forth additional facts regarding his medical condition and care from August 2018 (four months after the mass was removed) to March 2019 (Doc. 158, pp. 6–7). The Court opts not to recount those facts because they are not relevant to Plaintiff's allegations of deliberate indifference, which are confined to the time period of March 2017 to April 2018 (*see* Doc. 8; Doc. 66; *see also* Doc. 156-2 (Plaintiff's interrogatory responses indicating his claims of deliberate indifference occurred between March 24, 2017 and April 20, 2018)).

Woods, likewise testified that "non-surgical treatment tends to be the treatment of choice," and "most of the time what people would recommend is just do nothing." (Doc. 147-7, pp. 2, 3; Doc. 147-8, pp. 75–76). Dr. Woods also said the only purpose in removing a superficial hemangioma "is cosmetic," unless it has active bleeding, in which case removal may be necessary (Doc. 147-8, pp. 70, 75–76). He "would not have recommended [Plaintiff] get surgery, unless something would happe[n]." (*Id.* at p. 76). Plaintiff's treating surgeon, Adrian Martin, testified that, in this case, the mass was "profusely bleeding, and they could not stop the bleeding," so it "had to be removed" (Doc. 147-9, p. 37).

**Expert Opinions**

Plaintiff retained Dr. Kenneth Stein as an expert witness (*see* Doc. 153-4). Dr. Stein is board-certified in emergency medicine and internal medicine and has a subspecialty certification in neurocritical care (*Id.*). He has nearly thirty years of experience teaching and practicing emergency and critical care medicine (*Id.*). Dr. Stein's nine-page report is the only evidence of the content and substance of his opinions; neither party provided a deposition transcript for Dr. Stein to the Court.

Dr. Stein's ultimate opinion is that Wexford and the individual practitioners involved in Plaintiff's care failed to provide adequate and timely evaluation, referral, and treatment of the tender, painful, and enlarging mass on Plaintiff's head (Doc. 153-4, p. 8). Dr. Stein cited to the following instances as examples of Plaintiff not receiving "minimally competent care" (*Id.*).[10]  It took four months for Plaintiff to see a physician following the

---

[10] These are the instances that Plaintiff relied on in opposing summary judgment (*see* Doc. 158). The Court did not recount the portions of Dr. Stein's report that Plaintiff did not mention in his response brief.

initial referral in April 2017 (Doc. 153-4, p. 9). After he attempted to remove the mass, Dr. Shah "failed to schedule [Plaintiff] for specialty consultation or physician re-evaluation when he knew that the mass was not a normal cyst" and despite his testimony "that follow-up would have been a good idea and that he had not excluded malignancy as a cause of the mass." (*Id.*). Dr. Siddiqui saw Plaintiff in August 2017 and requested a three-month follow up visit, yet when he saw Plaintiff on November 29, 2017, Dr. Siddiqui "did not evaluate [Plaintiff's] complaints of the lump being painful[,] of headache[,] or [of] blurred vision" and "failed to refer [Plaintiff] for consultation with a surgical specialist." (*Id.*). Dr. Stein also noted that several referrals were made to Collegial for a surgical consultation, but those requests were "improvidently denied" (*Id.*). And finally, Dr. Stein pointed to a one-year delay in obtaining a surgical consultation as evidence that Plaintiff was not provided with minimally competent care (*Id.* at p. 8). Dr. Stein opined that "if the forehead mass had been appropriately evaluated and treated in a timely manner," that the pain and associated symptoms Plaintiff experienced would have been less severe and of shorter duration, the surgical incision would have been smaller, and the post-operative surgical incisional pain and tenderness would not have occurred or would have been less severe (*Id.* at pp. 9–10).

Defendants retained Dr. Timothy Woods as an expert witness. Dr. Woods is a board-certified surgeon with nearly thirty years of general surgery experience in both military and non-military hospitals and almost twenty years of experience teaching at medical schools (Doc. 147-7, pp. 2, 8–9). Dr. Woods authored a seven-page report and sat for a deposition (Docs. 147-7, 147-8). His ultimate opinion is that "the medical health care

and treatment provided to [Plaintiff] was adequate, appropriate, and consistent with the appropriate standard of care." (Doc. 14-7, p. 2). Dr. Woods explained that a cavernous hemangioma is a rare complication of injury (Doc. 147-7, pp. 2–3; Doc. 147-8, pp. 12–13). A superficial cavernous hemangioma, like Plaintiff's, is almost always a benign and indolent process (Doc. 147-7, p. 2). Furthermore, it would have "absolutely nothing" to do with the development of migraine headaches or cataracts and was not the cause of Plaintiff's blurred vision (Doc. 147-8, pp. 34, 37, 71–72; *see also* Doc. 147-7, p. 7). Dr. Woods further explained that for a superficial cavernous hemangioma, "non-surgical treatment tends to be the treatment of choice" and is "well within the standard of care for treatment" (Doc. 147-7, pp. 2, 3; *see also* Doc. 147-8, pp. 70–72, 75–76).

After reviewing the medical records in this case, Dr. Woods opined that the pain medications provided to Plaintiff were reasonable and within the standard of care (Doc. 147-7, p. 7). He testified that there was no issue with Plaintiff having to wait four months to see a doctor for the first time (Doc. 147-8, pp. 23–24). And he opined, in short, that the working diagnoses and treatment plans by Dr. Siddiqui, NP Moldenhauer, Dr. Shah, Dr. Smith, and Dr. Ritz were all reasonable and appropriate (Doc. 147-7, pp. 3–6; *see also* Doc. 147-8). In his view, neither a biopsy or ultrasound were medically necessary at any point (Doc. 147-7, p. 7; Doc. 147-8, pp. 30–31, 33), and it was not medically necessary to remove the mass prior to April 2018, when it started bleeding and the bleeding could not be controlled (*see* Doc. 147-8, pp. 23–24, 29–40, 47–48, 55, 70–72, 75–76, 81).

<u>LEGAL STANDARDS</u>

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the court is to view the record and draw all reasonable inferences in the light most favorable to the non-moving party and decide if there is genuine material dispute of fact that requires a trial. *Id.*; *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

All four of the claims proceeding in this case are Eighth Amendment deliberate indifference claims. To prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must prove that he suffered from an objectively serious medical condition and that prison officials were deliberately indifferent to that condition. *E.g., Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). For the purposes of summary judgment, Defendants do not dispute that the mass on Plaintiff's head was an objectively serious medical condition (*see* Doc. 145; Doc. 147; Doc. 156). Therefore, the only question

for the Court is whether the evidence, when viewed in a light most favorable to Plaintiff, establishes an issue of fact as to whether Defendants acted with deliberate indifference.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting* 839 F.3d at 662 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The inquiry is subjective and requires that the official "must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference.'" *Whiting* 839 F.3d at 662 (citing *Farmer*, 511 U.S. at 837). Deliberate indifference "requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). *See also Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("[N]either medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference.").

When it comes to medical professionals, "[t]here is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway*, 700 F.3d at 1073 (citation omitted). For that reason, a medical professional is entitled to deference in treatment decisions so long as they are based on professional judgment. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).

> By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and

> if no reasonable jury could discredit that claim, the doctor is entitled to
> summary judgment.

*Whiting* 839 F.3d at 662 (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). *See also Roe*, 631 F.3d 843 at 859 ("[I]t is implicit in the professional judgment standard itself . . . that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments.").

But when a plaintiff puts forward evidence that a doctor failed to exercise medical judgment, summary judgment is improper. *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024). *See also Whiting*, 839 F.3d at 662 ("[W]here evidence exists that the defendant knew better than to make the medical decision that he did, then summary judgment is improper . . . .") (quoting *Petties v. Carter*, 836 F.3d 722, 730–31 (7th Cir. 2016)). There are various circumstances that permit a jury to reasonably infer deliberate indifference, including a "blatantly inappropriate" treatment decision or a failure to act in the face of an obvious risk, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014*); Petties*, 836 F.3d at 729, persisting in a course of treatment known to be ineffective, *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022), an inexplicable delay in treatment, *Id.*, and a treatment decision shown to be "a substantial departure from accepted professional judgment, practice, or standards," *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'") (citation omitted).

<u>D<small>ISCUSSION</small></u>

Defendants moved for summary judgment as to each of the four counts in this case (Docs. 145, Doc. 147). Plaintiff did not respond to every aspect of Defendants' motions and instead focused on the failure to timely diagnose and treat the mass on his head (*see* Doc. 158). Defendants, however, are not automatically entitled to summary judgment on the claims that Plaintiff did not address, and the Court must still evaluate whether Defendants have "'show[n] that summary judgment [is] proper given the undisputed facts' . . . with those facts taken as usual in the light most favorable to the nonmovant." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (citation omitted); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (citation omitted). The Court will first address the unopposed arguments for summary judgment.

## A.  C<small>OUNT</small> 2 <small>RE</small>: I<small>NADEQUATE</small> P<small>AIN</small> M<small>EDICATION</small>

In Count 2, Plaintiff alleges that the pain associated with the hemangioma on his forehead was unnecessarily prolonged due to Wexford's policy of providing inadequate pain medication to inmates, as enforced by Doctors Siddiqui, Shah, Smith, and Ritz and NP Moldenhauer (Doc. 66, p. 3). Defendants argue they are entitled to summary judgment on Count 2 (Doc. 147, pp. 7–9), and Plaintiff opted not to respond (*see* Doc. 158).

Defendants put forth evidence that Plaintiff did not begin to complain of headaches and pain until several months after the mass appeared (Doc. 147, pp. 7–9). Thereafter, his complaints were periodic and frequently changed (*Id.*). When Plaintiff was discharged from the hospital following the removal of the mass, he was prescribed acetaminophen and ibuprofen, which are some of the same medications he had been

provided at the prison (*Id.*). Additionally, Defendants' expert, Dr. Timothy Woods, stated that he saw no evidence in the medical record that Plaintiff was provided inadequate pain medication and opined that the pain medications he received were reasonable and within the standard of care (*Id.*; Doc. 147-7, p. 7). The Court also notes that Plaintiff's expert did not offer any opinions related to the adequacy of pain medication (*see* Doc. 153-4). And Plaintiff's counsel did not ask any of the Defendants about pain medication at their depositions (Docs. 147-3, 147-4, 147-5, 147-6, 147-11). As such, it seems as though Plaintiff has effectively abandoned Count 2. The Court concludes that under these circumstances, Doctors Siddiqui, Shah, Smith, and Ritz and NP Moldenhauer are entitled to judgment as a matter of law as to Count 2.

Wexford is also entitled to summary judgment because without evidence that Plaintiff was provided with inadequate pain medication on any occasion, let alone occasions so numerous to demonstrate a widespread practice, there is no actionable injury from the policy or practice that he attributes to Wexford. *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) ("[P]rov[ing] that he was deprived of a federal right . . . [is] the first step in every § 1983 claim, including a claim against a municipality under *Monell*.").

## B. COUNT 8 RE: DELIBERATE INDIFFERENCE TO THE MASS

In Count 8, Plaintiff alleges that, from March 2017 until April 2018, Warden Lashbrook, Wexford, and Doctors Siddiqui, Shah, Smith, and Ritz were deliberately indifferent to his complaints of headaches, blurred vision, and pain from the lump on his forehead (Doc. 66).

### 1.  Warden Jacqueline Lashbrook

Plaintiff claims that Jacqueline Lashbrook, who was the Warden at Menard during the relevant time period, was deliberately indifferent because she knew he was receiving inadequate medical treatment by virtue of the grievances he filed, but she did not step in and help him (Doc. 67; *see also* Docs. 1, 8). Warden Lashbrook moved for summary judgment (Doc. 145), and Plaintiff opted not to respond (*see* Doc. 158, p. 1 n.1).

The Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)). However, non-medical officials can be held liable for deliberate indifference if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Giles*, 914 F.3d at 1050 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

It is undisputed that anything and everything Warden Lashbrook potentially knew about Plaintiff's situation was by virtue of the grievances that he filed (Doc. 145, ¶¶8, 10, 27, 28; *see also* Doc. 158; Doc. 147-10, pp. 76, 90–92 (Plaintiff's depo)). There are three relevant grievances, however, none of them provide any basis for holding Warden Lashbrook liable for deliberate indifference.

The first grievance was dated March 30, 2017, which was six days after Plaintiff

fell down the stairs (Doc. 147-10, pp. 16–25). At that point, he had not yet developed the mass on his forehead and therefore this grievance could not possibly have put Warden Lashbrook on notice about Plaintiff's complaints as to how the mass was being treated.

The second grievance was submitted on an emergency basis on January 14, 2018 (Doc. 145-3, pp. 11–15). Plaintiff complained that he had a knot on his head that hurt when touched and caused headaches and blurred vision, but the medical staff had not done anything about it despite his numerous complaints (*Id.*). Plaintiff asked to be seen by an outside doctor and to have the knot on his head examined and possibly removed (*Id.* at p. 13). Warden Lashbrook deemed the grievance to be non-emergent, (*id.* at p. 13), meaning that based on Plaintiff's narrative, she did not think he was facing an imminent risk of substantial personal injury or irreparable harm or that his situation impacted on the safety and security of the institution (Doc. 145-2, pp. 45, 53, 54). The grievance was then returned to Plaintiff and went back through the regular grievance process (Doc. 145-3, pp. 11, 13). The counselor consulted with Dr. Siddiqui and the Nursing Supervisor in early March and provided their response to Plaintiff (*Id.* at pp. 12, 13). The grievance officer then reviewed the grievance in mid-April 2018 and the current status of Plaintiff's medical care (*see id.* at p. 11). She determined that the grievance was moot because Plaintiff was "receiving treatment as the medical professional deemed appropriate." (*Id.*). She noted that Dr. Siddiqui had submitted a request for a general surgery evaluation but was given an alternative treatment plan by Collegial, which he was pursuing (*Id.*). A signatory for Warden Lashbrook concurred with the grievance officer (*see id.*).

Plaintiff did not make any argument that opting not to process the grievance on

an emergency basis established deliberate indifference, nor is that obvious to the Court. Warden Lashbrook did not deny treatment to Plaintiff or prevent him in any way from getting care. She simply disagreed that his situation presented an emergency, which is not patently unreasonable under the circumstances. Quite simply, not every medical condition qualifies as an emergency. When the grievance went back through the normal grievance process, medical staff was consulted and Plaintiff's medical records were reviewed. It was verified that Dr. Siddiqui had evaluated Plaintiff and was trying to obtain the exact treatment that Plaintiff wanted: an outside consultation. Therefore, even if the medical staff was initially slow to respond to Plaintiff's complaints, like he claimed, Warden Lashbrook knew that the facility physician was now trying to get Plaintiff approved for an outside consultation. The Warden was therefore "justified in believing that the prisoner is in capable hands" and her decision not to take any further action cannot be viewed as deliberate indifference. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). *See also Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service."); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [plaintiff's] concerns.").

The third and final grievance was also submitted on an emergency basis on April 24, 2018 (Doc. 145-3, pp. 8–10). Plaintiff complained that Dr. Siddiqui's request for an

outside consultation was denied three times by collegial before finally being approved, but it came too late because, shortly after the request was approved, the knot on his head burst open (*Id.*). Plaintiff asked to be "transferred to a facility where I can receive proper aftercare[,] evaluation[,] and treatment . . . ." (*Id.* at p. 9). Warden Lashbrook deemed the grievance to be an emergency (*Id.*). The grievance officer reviewed the grievance with Dr. Siddiqui and recounted that Plaintiff had been seen four times by Dr. Siddiqui in the past two months and 14 other times by medical staff since his fall on March 24, 2017, and received treatment at an outside hospital on April 20, 2018, after the mass burst (*Id.* at p. 8). The grievance officer concluded the grievance was moot because Plaintiff was "being monitored and treated as the medical professionals deem appropriate," and a signatory for Warden Lashbrook concurred (*see id.*).

Like the other two grievances, the third grievance also does not provide a basis for finding Warden Lashbrook acted with deliberate indifference. After she deemed the grievance an emergency, the grievance officer investigated Plaintiff's complaints, consulted with medical personnel, and verified that Plaintiff had been receiving medical care. The Warden was entitled to rely on the medical doctor's assurances that Plaintiff was receiving appropriate care and treatment, and the Warden's decision not to take any further action cannot be viewed as deliberate indifference. For these reasons, Warden Lashbrook is entitled to summary judgment as to Count 8.

### 2. Dr. Mohammed Siddiqui

Plaintiff contends that Dr. Siddiqui was deliberately indifferent by "failing to evaluate the growing mass or refer [Plaintiff] for a surgical evaluation for several months

beyond when [he] recognized it would be good to do so" (Doc. 158, p. 1). Plaintiff focuses on two specific incidents. The first is the appointment on November 29, 2017, which Plaintiff contends was the three-month follow-up appointment Dr. Siddiqui had previously ordered when he saw Plaintiff for the first time about the mass in August 2017 (Doc. 158, pp. 16–17). Plaintiff points to portions of Dr. Siddiqui's deposition where he testified it was "concerning" that the mass on Plaintiff's head was growing, "any pain should get attention," and complaints of blurred vision are "of course . . . concerning," even if they were unrelated to the mass (*Id.*; Doc. 147-4, pp. 44, 58, 59 (Siddiqui depo)). Plaintiff argues that despite these concerns, Dr. Siddiqui took no action to evaluate or treat the mass (Doc. 158, pp. 16–17). Plaintiff's expert, Dr. Kenneth Stein, opined that Dr. Siddiqui "failed to provide minimally competent care" because at the three-month follow-up appointment, he failed to evaluate Plaintiff's complaints of pain, headaches, and blurred vision, or refer Plaintiff for a surgical consultation (Doc. 153-4, pp. 8, 9).

The Court finds, however, that Plaintiff's evidence is insufficient for a reasonable jury to find that Dr. Siddiqui's actions on November 29, 2017, amounted to deliberate indifference. To begin with, both Plaintiff and his expert did not acknowledge that Plaintiff's appointment with Dr. Siddiqui on November 29th was in the hypertension clinic for the express purpose of addressing his high blood pressure (*see* Doc. 158, pp. 16–17; Doc. 153-4). More importantly, Plaintiff and his expert did not acknowledge that he saw two other providers earlier that month, *including the day before he saw Dr. Siddiqui*, and that those providers evaluated the mass and provided Plaintiff with treatment, including pain medication, adjusted blood pressure medications, a referral to see the eye

doctor, and a referral for an ultrasound of the mass (*see* Doc. 158, pp. 16–17; Doc. 153-4). It is not as though Dr. Siddiqui completely disregarded the need for follow-up, like Plaintiff implies. Rather, the follow-up had already occurred and there was no reason for Dr. Siddiqui to duplicate his colleague's efforts or to jump in before Plaintiff gave the prescribed treatments a chance to work or had the results of the ultrasound and eye exam.

As for the failure to refer Plaintiff for a surgical evaluation, "a prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." *Pyles*, 771 F.3d at 411. "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate.'" *Id.* (citations omitted). To the extent that Dr. Siddiqui decided to forego a referral to a surgeon on November 29, 2017, that was the same decision made by NP Zimmer four weeks prior and by NP Moldenhauer only one day prior, which demonstrates that Dr. Siddiqui's exercise of medical judgment was not a significant departure from accepted professional norms. *See Pyles*, 771 F.3d at 411 (physician's decision not to order MRI did not depart significantly from accepted professional norms when it was "implicitly endorsed" by every other doctor who examined plaintiff and likewise opted not to order an MRI). Also, Defendants' expert opined that Dr. Siddiqui's decision was appropriate because it was not medically necessary to remove the mass at that point (*see* Doc. 147-7, pp. 4, 7; *see* Doc. 147-8, pp. 29–40, 47–48, 55, 70–72, 75–76, 81).

While Plaintiff's expert opined that Dr. Siddiqui's actions on November 29th did not amount to minimally competent care, he did not offer any sort of explanation or

justification for this opinion (*see* Doc. 153-4). In other words, he did not give the "why" underlying his opinions. This type of conclusory opinion cannot be used simply to preclude summary judgment. *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997) ("[A] party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue") (quoting *American Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1464 (7th Cir. 1996) (Posner, J., dissenting)).[11] But even so, Plaintiff's expert's opinion that he should have been referred to a surgeon in November 2017 would show, at most, a disagreement among physicians, which is insufficient to establish deliberate indifference. *Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.") (emphasis in original); *Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). *See Reck*, 27 F.4th at 484–85 (dueling

---

[11] *Accord Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 977 (10th Cir. 2018) ("[U]nsupported and conclusory statement[s] . . ., even from experts, are insufficient to defeat summary judgment."); *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 663–64 (6th Cir. 2005) ("An expert opinion submitted in the context of a summary judgment motion must be more than a conclusory assertion about ultimate legal issues.") (internal quotations and citations omitted). *See also Turubchuk v. S. Illinois Asphalt Co., Inc.*, 958 F.3d 541, 554–55 (7th Cir. 2020) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (citation omitted); *Ciomber v. Cooperative. Plus*, 527 F.3d 635, 641 (7th Cir. 2008) ("Rule 26(a)(2) mandates a complete and detailed report of the expert witness's opinions, conclusions, and the basis and reasons for them."); *Salgado v. General Motors,* 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor . . . . [It] must include 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions."); *Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 480 (N.D. Ind. 2020) ("Even if eminently qualified, experts cannot offer opinions based solely on their say-so (what lawyers call *ipse dixit*).") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)).

expert opinions as to whether inmate should have been referred to a surgeon showed "at most, a disagreement among physicians which does, not, without more, establish the necessary reckless disregard for patient harm and pain required for a constitutional violation.").

In sum, the evidence submitted by Plaintiff is not sufficient for a reasonable jury to find that Dr. Siddiqui exhibited deliberate indifference on November 29, 2017.

The second incident that Plaintiff takes issue with is Dr. Siddiqui's failure "to initially follow up on a treatment plan" after the mass was incised in December 2017 (Doc. 158, p. 17). Plaintiff points to Dr. Siddiqui's testimony that it was "concerning" the mass had bled when incised "because lipomas don't bleed like that" and that Plaintiff needed to be sent for an evaluation with a specialist (*Id.* (citing Doc. 147-4, pp. 63–64)). Yet, according to Plaintiff, "Dr. Siddiqui failed to initially follow up on a treatment plan" (Doc. 158, p. 17). The Court is unpersuaded by this argument.

It is undisputed that Dr. Siddiqui saw Plaintiff on January 31, 2018, which was a little over one month after the mass was incised by Dr. Shah, and filled out a referral request for a surgical evaluation. The Court is unsure whether Plaintiff takes issue with the fact that this appointment only occurred because Plaintiff hit his head and not as a scheduled follow-up after the mass was incised, or if Plaintiff believes there was an unacceptable delay between the incision and the follow-up appointment. Perhaps it is both. Either way, Plaintiff did not submit evidence sufficient to raise a genuine issue of material fact as to whether Dr. Siddiqui's conduct after the mass was incised constituted reckless disregard for Plaintiff's medical well-being. More specifically, Plaintiff did not

cite to any evidence showing that Dr. Siddiqui knew prior to seeing Plaintiff in January 2018 that the mass had been incised, what the result of the procedure was, or that a follow-up appointment was needed and had not been scheduled. There is also no evidence that a one-month wait time for the follow-up appointment was outside the bounds of accepted professional norms. Nor is there any evidence from which it could be inferred that Plaintiff required more urgent care, much less that Dr. Siddiqui was aware of such need but failed to act.[12]  Consequently, no reasonable jury could conclude that Dr. Siddiqui exhibited deliberate indifference after the mass was incised in December 2017.

For these reasons, the motion for summary judgment is granted as to Dr. Siddiqui.

### 3.  Dr. Vipin Shah

Dr. Shah saw Plaintiff in the "ER" at Menard on December 27, 2017, and incised the mass on his head. Plaintiff contends that Dr. Shah was deliberately indifferent because he failed to arrange any follow-up treatment (Doc. 158, pp. 1, 15–16). According to Plaintiff, Dr. Shah acknowledged that the lipoma could be malignant and therefore should be monitored but did not refer Plaintiff for further evaluation or diagnosis, such as a follow-up appointment with the prison physician, a surgical consultation, or a trip to the hospital emergency department (*Id.* at p. 16).

The crux of Plaintiff's argument appears to be that Dr. Shah was deliberately

---

[12] *But see Greeno v. Daley*, 414 F.3d 645, 648–51 (7th Cir. 2005) (reversing summary judgment for prison physician in case where the need to rule out an ulcer was noted in the prisoner's medical file but prisoner was not referred to a specialist for two years, and specialist ultimately diagnosed him with an ulcer); *Jones v. Simek*, 193 F.3d 485, 491 (7th Cir. 1999) (holding prison physician was not entitled to summary judgment because the evidence supported an inference that the physician identified the inmate's condition as a "nerve problem" but then waited six months to authorize a referral to a neurologist).

indifferent because he turned a blind eye to the to the possibility of cancer (*see* Doc. 158, pp. 15–16). The Court does not find this argument persuasive. While it is true that Dr. Shah admitted he did not definitively rule out that the mass was malignant, there is nothing in the record that suggests there was any real concern about cancer. As Defendants' expert explained, all of the providers used words that implied a benign process: nodule, boil, cyst, hematoma, lipoma, etc. (Doc. 147-8, pp. 76–77). No one mentioned the possibility of "malignancy" in the medical records or described characteristics of a potentially malignant lesion, such as a firm, fixed, irregularly shaped nodule (*Id.*; *see also* Doc. 147-11, p. 75 (Smith depo); Doc. 147-9, pp. 29, 31, 32 (Martin depo)). Dr. Siddiqui, who has a background in oncology and fifty years of experience practicing medicine testified that the mass looked benign and felt benign (Doc. 147-4, pp. 7, 9, 45, 99). Defendants' expert testified that there was an "extraordinarily low" chance of malignancy (Doc. 147-8, pp. 23–24). And, Dr. Adrian Martin, Plaintiff's treating surgeon, likewise testified that in Plaintiff's situation, malignancy "would have been out of the question" (Doc. 147-9, p. 30). Plaintiff did not put forth anything to counter Defendants' evidence (*see* Doc. 158), which precludes any inference that cancer posed a serious risk to Plaintiff's health.

To the extent that follow-up care was warranted independent of any concern about cancer, it is undisputed that Dr. Shah did not order any aside from the removal of Plaintiff's stitches. However, the evidence does not permit an inference that Dr. Shah was deliberately indifferent in failing to do so. When Dr. Shah was asked if he scheduled Plaintiff for a follow-up visit, he responded that inmates "get standard wound care after

suturing," which meant that "[Plaintiff] was supposed to be seen by a doctor for suture removal," or a physician's assistant or nurse practitioner (Doc. 147-5, pp. 67, 93–94). When asked if he sought to refer Plaintiff for a biopsy or an ultrasound, Dr. Shah replied, "No, he was supposed to be followed up by the regular treatment team at Menard" (*Id.*). This testimony demonstrates that Dr. Shah did not order any follow-up because he was under the impression that one of the regular, full-time providers at Menard would see Plaintiff to remove his stitches and decide what to do next. To the extent Dr. Shah was wrong, it implies nothing more than negligence, which does not violate the Eighth Amendment.

But even if Dr. Shah had not been relying on Menard's medical staff to order follow-up care, Plaintiff has still not demonstrated that he could be held liable for deliberate indifference for not doing so himself. It is undisputed that Plaintiff saw Dr. Siddiqui on January 31, 2018, approximately one month after the mass was incised by Dr. Shah. Plaintiff did not argue or point to any evidence showing that a one-month wait time for the follow-up appointment was totally unjustified or outside the bounds of accepted professional norms for his particular condition (*see* Doc. 158). Nor did he argue that he required more urgent care, let alone that Dr. Shah was aware of such need (*see id*). *See Petties*, 836 F.3d at 730–731 ("To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain."). At that point, Dr. Shah thought Plaintiff had a lipoma and hematoma, which Defendants' expert testified was an appropriate diagnosis under the circumstances (Doc. 147-8, pp. 41–44). There is

no evidence that a lipoma and/or hematoma would require immediate medical attention (*see* Doc. 158).

Furthermore, Defendants' expert was adamant that the mass on Plaintiff's head was absolutely not the cause of his headaches or blurred vision (Doc. 147-8, pp. 34, 37, 70–72),[13] which Plaintiff did not dispute (*see* Doc. 158). While the mass could have possibly been causing some superficial pain in the local area (Doc. 147-8, pp. 14–15, 71), that did not mean that the mass had to be removed. As Defendants' expert explained, pain is only one of several things that must be taken into consideration when evaluating whether to remove a mass (Doc. 147-8, pp. 70–71). The pain Plaintiff was experiencing had to be counterbalanced with consequences and possible complications of surgery, including the pain of a surgical incision, recovery from surgery, the risk of a nerve injury that could cause permanent pain, risk of infection, and the potential of a large, appearance-altering scar (Doc. 147-8, pp. 70–71 ("[S]ometimes you just say . . . it's better to live with th[a]n to cut because of the potential surgical complications that come from it."); *see also* Doc. 147-9, pp. 40–41). At any rate, there is no evidence that Dr. Shah was even aware of Plaintiff's complaints of pain and other symptoms (*see* Doc. 158). *See Petties*, 836 F.3d at 728 ("[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm.").

---

[13] Dr. Smith also questioned how a hematoma on the side of Plaintiff's head would "affect his vision anatomically" (Doc. 147-11, p. 58). And the treating surgeon, Dr. Adrian Martin, related that, "[s]ometimes patients think that whatever bothers them is - - is related to that mass, but at times, in my clinical judgment, that particular mass . . . is probably not the reason why they have these symptoms. And I tell the patients, 'This is probably not . . . why you have these symptoms, and so I think removing the mass wouldn't - - it wouldn't help you.'" (Doc. 147-9, pp. 37–38).

For these reasons, there is no evidence from which a reasonable jury could find for Plaintiff on his claim that Dr. Shah was deliberately indifferent, and Dr. Shah is entitled to summary judgment.

### 4. Dr. Robert Smith

The record shows that Dr. Smith never directly treated Plaintiff and instead played a limited role in Plaintiff's medical care by consulting with Dr. Siddiqui during Collegial on one occasion about the first request for a referral to a general surgeon. Dr. Smith asked that Plaintiff be re-evaluated and his case re-presented. In other words, Dr. Smith asked for more information (*see* Doc. 147-11, pp. 56–63).

Plaintiff makes a very brief one-sentence argument that Dr. Smith was deliberately indifferent by not granting the request for a surgical consultation and instead asking that Plaintiff be re-evaluated, "*even though [Plaintiff] had previously been evaluated multiple times over the past ten months for his complaints*" (Doc. 158, p. 18) (emphasis in original). While the Court understands Plaintiff's frustration at being made to undergo another evaluation, he did not cite to any evidence that Dr. Smith's course of treatment was a substantial departure from accepted professional norms (*see* Doc. 158, pp. 17–18).[14] Nor was the decision so obviously wrong that a layperson could draw the required inference about the doctor's state of mind.

The bottom line is that Dr. Smith simply asked for more information. He testified

---

[14] Notably, Plaintiff did not cite to his expert opinion to support this contention. The Court suspects this is so because nothing in the report explains how and why Dr. Smith's decision could be seen as deliberate indifference. Nevertheless, Plaintiff did not cite it as support and the Court declines to consider it with respect to its analysis of the claim against Dr. Smith.

that during the collegial review process there is a back-and-forth discussion between the doctors, and it is not uncommon for questions to arise, the answers to which would be helpful to him in making his decision (Doc. 147-11, pp. 100–102). Defendants' expert agreed that this type of collaborative discussion happens all the time in the practice of medicine outside a prison (Doc. 147-8, pp. 78–80). While the exact type of information that Dr. Smith wanted was not documented in the medical records (*see* Doc. 153-2, pp. 36, 59, 60), and neither Dr. Smith nor Dr. Siddiqui could remember exactly what was discussed in Collegial (Doc. 147-11, pp. 54–56, 77–78, 79 (Smith depo); Doc. 147-4, pp. 70–71, 73 (Siddiqui depo)), Dr. Smith and Defendants' expert made clear that the additional information sought could have been any number of things that were not covered in the referral request (Doc. 147-11, pp. 57, 58, 64; Doc. 147-8, pp. 55–58).[15]

Additionally, there is no evidence that, as of the date of the Collegial review on February 8, 2018, Plaintiff's condition required urgent or emergency medical care. At that point, physicians knew it was not a cyst and suspected that it was a lipoma or solidified hematoma. There is no evidence that either condition generally requires immediate medical attention (*see* Doc. 158). Dr. Siddiqui and Defendants' expert further testified that there was no real concern from a medical standpoint of malignancy (Doc. 147-8, pp. 24,

---

[15] For example, Dr. Smith questioned if there was a reason the mass was referred to as a "cyst" when it was associated with significant bleeding and why Plaintiff was having visual disturbances because a mass on the outside of his head should not affect his vision (Doc. 147-11, pp. 57, 58, 64). Dr. Smith also wondered what precipitated Plaintiff's injury in March 2017, what type of injury he suffered, whether there was a loss of consciousness, and whether it was possible that he had a subdural bleed in the brain (*Id*. at p. 58). Defendants' expert theorized maybe Dr. Smith wanted to know the exact size of the mass, what it felt like, and whether Plaintiff had any ancillary symptoms when it was manipulated (Doc. 147-8, pp. 57–58).

76–77; Doc. 147-4, pp. 7, 9, 45, 99), and Plaintiff did not point to any evidence to the contrary (*see* Doc. 158). Plaintiff also did not dispute Defendants' evidence that the mass on his head was not the cause of his headaches or blurred vision, or that any localized pain he was experiencing did not automatically dictate that the mass had to be removed. Moreover, although the record may support a finding that Dr. Smith was aware from the Collegial consultation of Plaintiff's complaints of pain, there is nothing that shows he was aware of or appreciated the extent of Plaintiff's reported pain. And there is nothing that gives rise to an inference that Dr. Smith did not approve the referral request and asked for another evaluation as part of a deliberate effort to prolong Plaintiff's pain or otherwise withhold a known and more appropriate course of treatment. Dr. Smith's knowledge and role was simply too limited to create a material issue of fact as to whether he acted with deliberate indifference. *See, e.g., Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020) (affirming summary judgment for Wexford's Utilization Management physician). For these reasons, Dr. Smith is entitled to summary judgment.

### 5.  Dr. Stephen Ritz

Like Dr. Smith, Dr. Ritz also never directly treated Plaintiff and instead played a limited role in his medical care by consulting with Dr. Siddiqui about the need for a surgical evaluation on four occasions. The first time was on March 15, 2017, and Dr. Ritz asked for a recent picture of the mass before deciding whether to approve or deny the referral request. The second time was a week later on March 23, 2017, and Dr. Ritz asked for an ultrasound. The third time was two weeks later on April 6, 2017, and Dr. Ritz wanted to wait for the results of the previously ordered ultrasound. And the fourth time

was on April 19, 2017, and Dr. Ritz approved the request for a surgical evaluation.

Plaintiff contends that Dr. Ritz was deliberately indifferent by denying the referral request three times before finally approving it, right before the mass burst and was removed in an emergency surgery, which could have been avoided (Doc. 158, pp. 1–2). But Plaintiff did not offer any meaningful argument or explanation, nor cite to any evidence, showing that Dr. Ritz's decisions were far outside the range of accepted professional norms (*see* Doc. 158, pp. 17–18).[16]

Moreover, as with Dr. Smith, Dr. Ritz was simply trying to gather more information, and nothing about his decisions strike the Court as blatantly inappropriate. He did not waste an inordinate amount of time; approximately one month went by between his first consultation and the fourth, when he approved the referral request. There is nothing that shows he was aware of or appreciated the extent of Plaintiff's reported pain. There is also nothing that gives rise to an inference that he was inexplicably or intentionally dragging things out in an effort to prolong Plaintiff's pain or otherwise withhold a known and more appropriate course of treatment. And finally, Defendants' expert specifically opined that each of Dr. Ritz's decisions were "within the standard of care and reasonable" (Doc. 147-7, pp. 5–6), and he expounded on his opinions in his deposition testimony (*see* Doc. 147-8, pp. 63, 64–66).

---

[16] Again here, the Court notes that Plaintiff did not cite to his expert's opinions for support. The Court suspects that this is because his expert did not provide any type of explanation as to how and why Dr. Ritz's decision could be seen as deliberate indifference. Nevertheless, Plaintiff did not offer it as support and the Court declines to analyze it further with respect to this claim.

On this record, no reasonable jury could find in favor of Plaintiff and therefore Dr. Ritz is entitled to summary judgment.

## C. WEXFORD

A private corporation that has contracted to provide essential government services, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a municipality is liable only for "its own violations of the federal Constitution and laws," and cannot be held vicariously liable for the constitutional torts of its employees and agents. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

To succeed on a *Monell* claim, a plaintiff must first show that "that he was deprived of a federal right." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quoting *LaPorta*, 988 F.3d at 986). Second, a plaintiff must show action pursuant to a municipal policy or custom. *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 986). Third, the plaintiff must show that "'the policy or custom demonstrates municipal fault,' i.e., deliberate indifference." *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 986). And finally, the plaintiff must establish causation by showing that the policy or custom was "the 'moving force' behind the federal-rights violation." *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 987). *Accord Calderone v. City of Chicago*, 979 F.3d 1156, 1163 (7th Cir. 2020) (quoting *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020)) (describing elements of a *Monell* claim).

As indicated at the outset of this Order, there are four claims aimed at Wexford. Count 1 alleges Wexford had a policy of understaffing the prison health care unit. Count 2 alleges Wexford had a policy of providing inadequate pain medication to inmates, and the Court has already determined that Wexford is entitled to summary judgment on this claim. *See supra* at pp. 17-18. Count 4 alleges that Wexford had a practice of turning a blind eye to the inadequate medical treatment provided to inmates at Menard. And Count 8 relatedly alleges that Wexford had a practice of responding with deliberate indifference to Plaintiff's complaints between March 2017 until 2018.

### 1. Count 1 re: Understaffing

Defendants argue, and Plaintiff does not contest, that Plaintiff has no evidence the health care unit was understaffed or that shows the alleged understaffing caused his injury (Doc. 147, p. 18; *see* Doc. 158, pp. 10–15). Wexford is therefore entitled to summary judgment as to Count 1.

### 2. Counts 4 and 8

In Counts 4 and 8, Plaintiff alleges that Wexford had a widespread practice or custom of providing constitutionally subpar medical care and/or a practice and custom of turning a blind eye to deficient medical care (Doc. 66). These Counts can be considered together as they are variations on the same theme.

According to Plaintiff, Wexford had a "widespread practice of delaying diagnosis, treatment, and referrals to outside providers/procedures," which he also characterized as a "policy of inaction," that led to "significant and harmful delays" in diagnosing and treating the mass on his head (Doc. 158, pp. 1, 10, 11, 12). Although Plaintiff claims there

is a "policy of inaction," he does not point to an express policy of Wexford and in fact concedes there is no "official Wexford policy" at issue (Doc. 158, p. 11). Nor does he identify a decision by a final policymaker (*see id*.). Therefore, Plaintiff's claim turns on the identification of an unwritten but widespread practice.

To succeed on this type of claim, Plaintiff must show that the "practice was 'so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527 (2021) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789, 790 (7th Cir. 2006)). *See also Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 826 (7th Cir. 2022) ("An unwritten practice may subject a municipality to liability only if it is 'so entrenched and well-known as to carry the force of policy.'") (quoting *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014)). "This requires 'more than a showing of one or two missteps.'" *Hildreth*, 960 F.3d at 426 (quoting *Phelan*, 960 F.3d at 426)). "[P]roof of isolated acts of misconduct will not suffice[.]" *Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003). Rather, the Seventh Circuit "ha[s] said in general terms that an inmate can meet this burden by offering 'competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006)).

Plaintiff relies on two particular aspects of his medical care to support his claim that Wexford's policy of inaction led to significant delays in diagnosing and treating the mass. First, he points to the fact it took three months to see a physician for the first time about the mass (Doc. 158, pp. 12, 13). Second, he points to a "significant delay" in

receiving outside medical care to diagnose and treat the mass because it took over a year to get an ultrasound and approval for a general surgery evaluation, he never got a biopsy, and Wexford's own internal deadlines for following up on alternative treatment plans were not adhered to (*Id.* at p. 14).[17]

As an initial matter, the Court notes that Plaintiff's evidence is limited to his own experience. He did not present any evidence that other inmates also dealt with the same treatment issues that he did. The Seventh Circuit has held that "[w]hile it is not 'impossible' for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, 'it is necessarily more difficult . . . because what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Hildredth*, 960 F.3d at 426 (quoting *Grieveson*, 538 F.3d at 774). The Court is skeptical that this is one of the rare cases where the instances of delayed and/or inadequate care are numerous enough to satisfy the "more difficult" task of proving an entrenched, pervasive widespread practice or systemic failure. But Plaintiff's claims also fail for other reasons.

With respect to the delay in seeing a physician for the first time, there does not appear to be any justification for this delay. It is concerning that Plaintiff had to be referred to a physician four times and that it took four months before he was actually able to see a doctor, especially since both Menard's written policy and Wexford's policy require an inmate to be seen by a physician within 72 hours of the referral (Doc. 153-6, p.

---

[17] To the extent there were other occurrences, such as cancellations, dropped referrals etc., that could conceivably be part of a claim for a widespread practice of delaying medical care, they do not factor into the Court's analysis. The Court addresses only the arguments made by the parties in their briefs and does not attempt to independently evaluate arguments that may have been available but were not made.

11; Doc. 147-4, pp. 48–49 (Siddiqui depo)). That being said, Plaintiff has not shown that this delay was attributable to Wexford. Specifically, Plaintiff did not provide any evidence that Wexford, or any of its employees, were responsible for scheduling inmate appointments after a nurse referred them to see a physician (*see* Doc. 158). "Without some showing that Wexford had such responsibility, we cannot impose on it liability for the system's alleged malfunction." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 489 (7th Cir. 2022).

Plaintiff also has not shown that the delay in seeing a doctor for the first time posed a constitutional problem. By the time he saw Dr. Siddiqui in August 2017, Plaintiff had not yet begun to complain about headaches or blurred vision, and he reported only occasional pain at the site of the mass when he laid on the right side of his head. This is not the type of "chronic and substantial" pain that implicates Eighth Amendment concerns. *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). *See also Gabb*, 945 F.3d at 1034 ("serious but avoidable pain" can support an Eighth Amendment deliberate indifference claim) (citation omitted). Defendants' expert also said that it was "completely normal" to have to wait several months to see a physician for a nodule like Plaintiff's, there was an "extraordinarily low" chance of malignancy, and it was not necessary to see a physician any earlier (Doc. 147-8, pp. 23–24). While the delay that Plaintiff experienced cannot be condoned, it is not actionable in this case because there is no evidence that Wexford was responsible for the delay nor is there evidence that it was

of any consequence to Plaintiff's health.[18]

As for the asserted delay in receiving outside medical care to diagnose and treat the mass, Plaintiff takes issue with the fact that it took a year to get an ultrasound and approval for a general surgery evaluation, that he never got a biopsy, and that Wexford's own internal deadlines for following up on alternative treatment plans were not adhered to (Doc. 158, p. 14). However, the evidence Plaintiff put forth does not demonstrate that deadlines for alternative treatment plans were not adhered to (*compare* 158-1 *with* Doc. 156, pp. 5,6 *and* Doc. 156-3).

Nor does it show that the failure to order a biopsy violated his right to adequate medical care or caused him any harm. "[T]he decision to forgo diagnostic tests 'is a classic example of a matter for medical judgment.'" *Pyles*, 771 F.3d at 411 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). As previously discussed, none of the providers in this case had any real concern that the mass was malignant, which explains why none of them ordered a biopsy. And Plaintiff did not put forth any expert testimony or other evidence that a biopsy was medically necessary and the providers decision not to order a biopsy substantially departed from accepted professional practices (*see* Doc. 158, pp. 14–15; Doc.

---

[18] *See Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) ("It is not enough . . . simply to point to a delay, which may or may not reflect deliberate indifference. Instead, we ask how serious the condition in question was, how easy it would have been to treat it, and whether it exacerbated an injury or unnecessarily prolonged pain.") (citing *Petties*, 836 F.3d at 730–31). *See also Gabb*, 945 F.3d at 1032 ("In order to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.'") (citation omitted); *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("Section 1983 is a tort [and] [a] tort to be actionable requires injury.")). *Cf. Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 489 (7th Cir. 2022) (affirming summary judgment for Wexford on claim that health care unit was chronically understaffed where there was no evidence that understaffing harmed prisoner).

153-4 (Stein report)). *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). Furthermore, pathology ultimately determined that the mass was a cavernous hemangioma, which is not cancerous and has no potential to become cancerous (Doc. 147-8, pp. 13, 75).

That leaves the failure to refer him for an ultrasound or a general surgery evaluation for nearly a year after the mass appeared. The Court has already ruled, however, that none of the individual Defendants unjustifiably delayed diagnosing or treating the mass. Plaintiff made no argument that the other non-Defendant medical providers involved in his care acted with deliberate indifference, (*see* Doc. 158), nor is it readily apparent. Rather, Defendants put forth evidence that an ultrasound was never medically necessary, and Plaintiff did not offer any evidence to the contrary (*see* Doc. 158). Defendants also put forth evidence that it was not medically necessary to remove the mass at any point, but Dr. Siddiqui nevertheless requested a surgical consultation, which was approved approximately three months later after he provided the additional information sought by Wexford's corporate physicians. While Plaintiff would have preferred to be seen by a surgeon and to have the mass removed sooner, inmates are not entitled to "demand specific care" or to receive the "best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). They are only entitled to "adequate medical care." *Holloway*, 700 F.3d at 1073 (citation omitted). In this instance there is no reliable expert testimony that the medical providers' decisions fell outside the bounds of adequate medical care, and their decisions were not so obviously wrong that a layperson could draw the required inference about the doctors' state of mind without expert testimony.

Consequently, there is no constitutional injury that could possibly be attributed to Wexford's purported policy of delaying outside medical treatment or deliberately disregarding its physicians unjustifiably delaying treatment. Accordingly, Wexford is entitled to summary judgment as to Counts 4 and 8.

C**ONCLUSION**

The motions for summary judgment filed by Defendant Jacqueline Lashbrook (Doc. 145) and Defendants Michael Moldenhauer, Stephen Ritz, Vipin Shah, Mohammed Siddiqui, Robert Smith, and Wexford Health Sources, Inc. (Doc. 146) are **GRANTED**. This case is **DISMISSED** with prejudice. The Clerk of Court is **DIRECTED** to enter judgment in Defendants' favor and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 29, 2024**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**